# In the
# United States Court of Appeals
## for the Seventh Circuit

BEVERLY BALLARD,

*Plaintiff-Appellee,*

v.

CHICAGO PARK DISTRICT,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:10-cv-01740.
The Honorable **Edmond E. Chang**, Judge Presiding.

## BRIEF OF PLAINTIFF-APPELLEE
## BEVERLY BALLARD

EUGENE K. HOLLANDER
PAUL W. RYAN
BRADLEY J. SMITH
THE LAW OFFICES OF
  EUGENE K. HOLLANDER
230 West Monroe Street
Suite 1900
Chicago, Illinois 60606
(312) 425-9100

*Attorneys for Plaintiff-Appellee*


COUNSEL PRESS · (866) 703-9373


PRINTED ON RECYCLED PAPER

**CIRCUIT RULE 26.1  DISCLOSURE STATEMENT**

Appellate Court No: 13-1445

Short Caption: Beverly Ballard v. Chicago Park District

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Beverly Ballard

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   The Law Offices of Eugene K. Hollander

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      n/a

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      n/a

Attorney's Signature: /s/ Paul W. Ryan                          Date: September 17, 2013

Attorney's Printed Name: Paul W. Ryan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes  X    No _____

Address:  The Law Offices of Eugene K. Hollander

   230 W. Monroe, Suite 1900, Chicago, Illinois 60606

Phone Number: (312) 425-9100                    Fax Number: (312) 899-8003

E-Mail Address: pryan@ekhlaw.com

rev. 01/08 AK

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT.................................................................. i

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ............................................................................................ iii

JURISDICTIONAL STATEMENT .................................................................................1

STATEMENT OF THE ISSUE.......................................................................................1

STATEMENT OF FACTS ............................................................................................1

SUMMARY OF THE ARGUMENT .............................................................................9

ARGUMENT ..............................................................................................................12

    A.    Standard of Review...............................................................................12

    B.    Legal Standard For FMLA Interference Claims....................................12

    C.    Beverly's Trip to Las Vegas Was Protected Under the FMLA ..............13

        i.    Under the plain language of the FMLA, taking time off to "care for" a relative is protected regardless of whether the relative is receiving active medical treatment...............................13

        ii.    Appellant's public policy arguments are unpersuasive ..............17

        iii.    The cases cited by Appellant in support of its argument that Beverly did not "care for" her mother are distinguishable or unpersuasive................................................................................19

        iv.    Beverly cared for her mother within the meaning of the FMLA ..................................................................................23

        v.    The Fairygodmother Foundation trip to Las Vegas was part of Sarah Ballard's ongoing care from Horizon Hospice and Palliative Care ....................................................................24

CONCLUSION............................................................................................................29

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)(7)........................30

CERTIFICATE OF SERVICE .....................................................................................31

# TABLE OF AUTHORITIES

## CASES

Bell v. Prefix, Inc., 2009 U.S. App. LEXIS 7006 (6th Cir. 2009)...................................................16

Bhd. Of Maintenance Of Way Employees v. CSX Transp., Inc.,
2005 U.S. Dist. LEXIS 37950 (N.D. Ill. 2005) ...................................................................... 21, 22

Brown v. Auto Components Holding, LLC, 622 F.3d 685 (7th Cir. 2010)................................. 12

Gradilla v. Ruskin Mfg., 320 F.3d 951 (9th Cir. 2003) ......................................................... 21, 22

Harrell v. United States Postal Serv., 445 F.3d 913 (7th Cir. 2008) ............................................ 12

Leakan v. Highland Co., 1997 U.S. Dist. LEXIS 20381 (E.D. Mich. 1997)................................ 21

Marchisheck v. San Mateo County, 199 F.3d 1068 (9th Cir. 1999)........................................19, 20

McDermott Int'l, Inc. v. Wilander, 498 U.S. 337 (U.S. 1990) ......................................................14

Tayag v. Lahey Clinic Hospital, 632 F.3d 788 (1st Cir. 2011)................................................21, 23

Tellis v. Alaska Airlines, 414 F.3d 1045 (9th Cir. 2005) ............................................................. 20

Wellpoint, Inc. v. Commissioner of Internal Revenue, 599 F.3d 641 (7th Cir. 2010) ..................12

## STATUTES

29 U.S.C. § 2612(A)(1)(C) ............................................................................................................13

## FEDERAL RULES OF EVIDENCE

Fed. R. Evid. 803(6)......................................................................................................................26

## REGULATIONS

29 C.F.R. § 825.116(a)................................................................................13, 16, 20, 25

29 C.F.R. §825.114(a)(2)(iv) ..............................................................................................15, 20

## CONGRESSIONAL REPORTS

S. Rep. No. 103-3, at 24 (1993) ...........................................................................11, 13, 15, 24, 25

## MISCELLANEOUS

Palliative Care in Cancer, available at http://www.cancer.gov/cancertopics/factsheet/Support/ Palliative-care .................................................................................................................................28

Palliative Care, An Ethical Obligation, available at http://www.scu.edu/ethics/practicing /focusareas/medical /palliative.html ............................................................................................24

Palliative Care:  Symptom relief during illness, available at http://www.mayoclinic.com /health/palliative-care/MY01051 ................................................................................................24

# JURISDICTIONAL STATEMENT

The jurisdictional summary in the appellant's brief is complete and correct.

# STATEMENT OF THE ISSUE

Appellee agrees that Appellant has accurately set forth the question certified by the district court. However, Appellee respectfully disagrees with the district court's conclusion that the trip to Las Vegas was not part of Sarah Ballard's "ongoing treatment." In the event that this Court answers the certified question in the negative, it should consider whether the district court's denial of summary judgment should be affirmed on the ground that the Las Vegas trip was arranged as part of the hospice services provided to Sarah Ballard by Horizon Hospice.

# STATEMENT OF FACTS

### i. Beverly Ballard was the primary caregiver for her terminally ill mother

Appellee Beverly Ballard's Mother, Sarah Ballard, was diagnosed with Congestive Heart Failure on April 26, 2006. (R[1]. 54[2], p. 16, ¶1). Sarah Ballard lived with Beverly and received hospice services from Horizon Hospice & Palliative Care at Beverly's home. (R. 54, p. 16, ¶1). Beverly was her mother's primary caregiver. (R. 54, p. 16-17, ¶ 2-3). Beverly's care giving responsibilities included preparing healthy meals, giving her mother insulin shots, administering medicine, operating a pump to remove fluids from her mother's heart, bathing her mother, pushing her mother in her wheelchair, helping her mother walk, giving her mother oxygen when she needed it,

---

[1] Citations to the Record ("R") consist of the district court document number, followed by the page number ("p"), and if applicable, the paragraph number ("¶").

[2] Citations to "R. 54" refer to Plaintiff-Appellee's Amended L.R. 56.1(b) Response to Defendant-Appellant's Statement of Material Facts and Plaintiff-Appellant's Statement of Additional Material Facts.

providing her mother with transportation, including transportation to the hospital if necessary, making sure her mother was comfortable, saying soothing things to her, making her feel good by, for instance, rubbing her head and back and propping her up in bed with pillows, and otherwise acting as her nurse. (R. 54, p. 16-17, ¶ 3).

ii.    Beverly notified the Park District of her caregiving responsibilities[3]

Eric Fischer was and is the Assistant Manager of Beaches and Pools and had supervisory authority over Plaintiff. (R. 54, p. 17, ¶ 4). Fischer reviewed the timesheets of all Natatorium Instructors. (R. 54, p. 17, ¶ 5). Employees were allowed to submit their Leave Requests with their time sheets. (R. 54, p. 17, ¶ 8). Fischer's standard procedure was that if he found FMLA paperwork mixed in with timesheets, he would forward it to Human Resources. (R. 54, p. 17, ¶ 8).

In March 2007, Sarah Ballard's physician, Lisa Shives, filled out a Certification of Health Care Provider form, which certified that Beverly was her mother's primary caregiver. (R. 54, p. 18, ¶ 10; Ballard Dep. Ex. 5, R. 38-3[4], p. 16-18). The Certification of Healthcare Provider form stated, in pertinent part, "Patient [Sarah Ballard] does require assistance from others, and employee [Beverly Ballard] is the primary person supporting patient. Patient relies on employee for safety needs and transportation. Needs for personal care and medical care are expected to increase in the coming months as patient declines." (R. 54, p. 18, ¶ 10). The Certification of Healthcare Provider also

_____

[3] Although this appeal is limited to the issue of whether Appellee's leave of absence to accompany her mother on the trip to Las Vegas constituted "caring for" her mother within the meaning of the FMLA, Appellant has included a summary of the facts relating to the issue of whether Appellee gave proper notice of her intent to travel to Las Vegas. Accordingly, for the sake of completeness, Appellee includes facts relating to the notice issue as well in this statement of facts.

[4] Citations to "R. 38-3" refer to the exhibits to the deposition of Beverly Ballard.

stated that "Psychological comfort care and support is an additional benefit that employee is able to offer patient." (R. 54, p. 18, ¶ 10). In March 2007, Beverly submitted the completed Certification of Health Care Provider form along with her payroll documents in the payroll envelope at her supervisor Rachel's direction. (R. 54, p. 18, ¶ 11).

In June 2007, Beverly told Eric Fischer that she had FMLA in connection with her mother's illness and that she was her mother's caregiver. (R. 54, p. 19, ¶ 12). On June 17, 2007 and November 13, 2007, Beverly submitted letters from Horizon Hospice & Palliative Care that detailed her care giving responsibilities for her mother. (R. 54, p. 19, ¶ 13-14).

Eric Fischer received the November 13, 2007 Letter from Horizon Hospice & Palliative Care. (R. 54, p. 19, ¶ 14). Eric Fischer read the November 13, 2007 letter sometime in November 2007. (R. 54, p. 19, ¶ 14). Fischer also shared the letter with Janet McDonough, Manager of Beaches and Pools, shortly after November 13, 2007. (R. 54, p. 19, ¶ 14). McDonough read the letter and told Fischer that they had to turn it in to Human Resources. (AF 14). Fischer testified that he believed that McDonough provided the letter to Human Resources. (R. 54, p. 19, ¶ 14). The November 13, 2007 letter from Horizon Hospice & Palliative Care states that "Sarah Ballard is a current patient of Horizon Hospice; she was admitted into our program on April 25, 2006 and has a terminal diagnosis of end-stage CHF." (R. 54, p. 20, ¶ 15). The letter also states that "As a result of her terminal status, Ms. Ballard does require assistance in caregiving. Beverly and her mother live in the same home, and it is Beverly's responsibility to assist her mother as needed." (R. 54, p. 20, ¶ 15).

iii.    Sarah Ballard's social worker from Horizon Hospice assisted in arranging a dying wish for her through the Fairygodmother Foundation.

As part of its plan of care in providing hospice services to terminally ill patients, Horizon Hospice & Palliative Care's medical and psychosocial team strives to help patients identify and meet end-of-life goals.  (R. 54, p. 20, ¶ 16; Declaration of Roxanne Dominis, included in R. 55[5] at pg. 3, ¶ 4).  During the time that Sarah Ballard was receiving hospice services from Horizon Hospice & Palliative Care, she began to talk with her team members from Horizon Hospice about being able to take a trip with her family members to Las Vegas.  (R. 54, p. 20, ¶ 16).  Sarah Ballard's wish was to travel to Las Vegas.  (Ballard Dep.,[6] R. 38-2, 202:24 – 203:9).  After determining that she was medically stable enough to take this trip, Horizon Hospice's social worker was able to identify a foundation, The Fairygodmother Foundation, that would be able to facilitate and fund this trip for Sarah Ballard and Beverly Ballard.  (R. 54, p. 20-21, ¶ 16).  The Fairygodmother Foundation was a not-for-profit charitable organization that granted end-of-life wishes to adults who were facing terminal illnesses with less than one year to live.  (R. 38[7], p. 10, ¶  37; Ballard Dep. Ex. 12, R. 38-3 at p. 34).  The wishes granted by the foundation served the purpose of providing "an opportunity for peace, closure, and cherished memories."  (Ballard Dep. Ex. 12, R. 38-3 at p. 34; R. 38, p. 11, ¶38).

Lindsay Wooster was the individual who informed Beverly and her mother of the

---

[5] Citations to "R. 55" refer to Plaintiff's Supplemental Appendix to Plaintiff's Local Rule 56.1(B) Statement.

[6] Citations to "R. 38-1" and "R. 38-2" refer to the deposition transcript of Beverly Ballard, which was filed as document 38-1 and 38-2 in the district court, followed by the document number in the record on appeal and the page and line in the deposition transcript.

[7] Citations to "R. 38" refer to Defendant-Appellant's Local Rule 56.1 Statement of Material Facts and the exhibits thereto.

Fairygodmother Foundation in November 2007. (Ballard Dep., R. 38-1, 151-152). Ms. Wooster was the primary Social Worker from Horizon Hospice for Beverly and her mother. (Ballard Dep, R. 38-1, 101; Declaration of Roxanne Dominis, included in R. 55 at p. 2, ¶ 2). Around November 2007, Ms. Wooster informed Sarah Ballard that the Fairygodmother Foundation was an organization like Make-A-Wish and that she might be a candidate because she was diagnosed as having six months to live. (Ballard Dep., R. 38-1, 151:2 – 151:9). Ms. Wooster assisted Beverly and her mother in filling out the Fairygodmother Foundation application, and Ms. Wooster submitted the application. (Ballard Dep., R. 38-2, 153:23 – 154:17). Prior to December 19, 2007, Sarah Ballard signed a "Wish Agreement" with the Fairygodmother Foundation. (R. 38, p. 6, ¶18, Ballard Dep. Ex. 9, R. 38-3, p. 27-31). Ms. Wooster filled out the first page of the Wish Agreement. (Ballard Dep., R. 38-2, 158:1-6; Ballard Dep. Ex. 9). Ms. Wooster personally brought Beverly and her mother a December 19, 2007 letter from the Fairygodmother Foundation which informed them that the trip to Las Vegas had been granted. (Ballard Dep., R. 38-1, 149:12 – 150:16; Ballard Dep. Ex. 7B, R. 38-3, p. 23). The trip to Las Vegas took place from January 21, 2008 through January 26, 2008. (R. 54, p. 20-21, ¶16). Beverly functioned as the primary caregiver for Sarah Ballard on this trip. (R. 54, p. 16, ¶ 2, 3; R. 54, p. 18, ¶ 10; R. 54, p. 20-21, ¶ 16; R. 54, p. 25, ¶ 32-33).

    iv.    <u>Beverly notified the Park District that she intended to use FMLA leave to accompany her mother on the Fairygodmother Foundation trip to Las Vegas</u>

On December 19, 2007, during a break at an Hourly Instructors' Meeting, Beverly told Eric Fischer that her mother had been granted a trip that was to take place in January 2008 and handed the December 19, 2007 Letter from the Fairygodmother Foundation to

him.  (R. 54, p. 21, ¶17).  Beverly wrote the dates of the Las Vegas trip on the back of the December 19, 2007 Fairygodmother Foundation letter because Fischer wanted to know what dates she was requesting in connection with the trip.  (R. 54, p. 21, ¶18).

Beverly discussed the Family and Medical Leave Act with Fischer on December 19, 2007.  (R. 54, p. 21-22, ¶19).  Beverly wrote "FL" under some of the dates that she listed on the back side of the December 19, 2007 Fairygodmother Foundation letter.  (R. 54, p. 21-22, ¶19).  Fischer questioned Beverly about what "FL" stood for, and she told him that "FL" was her shorthand for "family and FMLA."  (R. 54, p. 21-22, ¶19). Fischer asked Beverly, "You have FMLA?"  (R. 54, p. 21-22, ¶19).  Beverly responded that she did, and Fischer said "okay" and that he would get back to her.  (R. 54, p. 21-22, ¶19).  Beverly waited until January 15, 2008 to make a written request for leave in connection with the Las Vegas trip because Eric Fischer, during their December 19, 2007 conversation, said it was too soon, he had a lot to handle, and he would get back with her. (R. 54, p. 21, ¶20).  At the time that Beverly submitted her January 15, 2008 Leave Request, she did not know that she was supposed to submit it to Human Resources.  (R. 54, p. 24, ¶ 27).  It was Beverly's understanding that Eric Fischer, as a manager, was the one who handled her time and gave permission to go on leave.  (R. 54, p. 24, ¶ 27). Although Appellant claim that Eric Fischer and Janet McDonough did not have authority to approve FMLA leave requests, the Leave Request form that Beaches and Pools employees routinely submitted to Fischer has an option to request FMLA leave.  (R. 54, p. 23-24, ¶ 26).

iv.    Appellant failed to advise Beverly of her FMLA rights and terminated her in violation of the FMLA

In 2007, Eric Fischer was aware of the Family and Medical Leave Act, but he

"was not too clear about it."  (R. 54, p. 23, ¶  23).  Mr. Fischer never had any training on the FMLA.  (R. 54, p. 23, ¶23).  Until approximately March 2010, Mr. Fischer did not know the procedure an employee had to follow to request FMLA leave.  (R. 54, p. 23, ¶23).  Mr. Fischer did not know that the FMLA allowed an employee to take intermittent leave of absence until around March 2010.  (R. 54, p. 23, ¶  23).

Rebecca Reierson has been the Director of Human Resources for the Chicago Park District since November 2006.  (R. 54, p. 23, ¶24).  According to Ms. Reierson's testimony, if an employee notifies her supervisor that she needs time off to care for a family member who has a serious health condition, the supervisor is obligated to refer the matter to Human Resources so that the Park District can provide the appropriate paperwork to the employee.  (R. 54, p. 23, ¶ 24).

From January 14, 2008 through January 18, 2008 (the Friday before her Monday, January 21st departure to Las Vegas with her mother) Beverly tried numerous times to contact Eric Fischer about her trip, as she had not heard back from him.  (R. 54, p. 23, ¶ 25, 26; R. 54, p. 24, ¶ 28).  However, Fischer refused to speak with her, and Beverly was only able to speak with Fishcer's Secretary, Erica.  (R. 54, p. 24, ¶28)  Although Erica did not make a specific request for Beverly's FMLA Certification, Beverly delivered her completed March 2007 Certification of Healthcare Provider Form to the administration building on January 17, 2008 and left it on Erica's desk around 8:30 or 8:45 a.m.  (R. 54, p. 24, ¶ 29).  On January 18, 2008, Erica informed Beverly that she was giving Fischer her messages.  (R. 54, p. 24, ¶28).  Prior to her trip, Fischer did not call Beverly back.  (R. 54, p. 24, ¶28; R. 54, p. 24-25, ¶30).  Although Beverly had not received formal approval of her request for leave to travel with her mother, she believed that her FMLA

leave would be approved based on her conversations with Erica, who had told her that if she got her paperwork in order, she should be fine. (R. 54, p. 25, ¶ 31).

On January 17th or 18th, 2008, Sarah Ballard's doctor gave Beverly instructions on how to care for her mother while they were in Las Vegas. (R. 54, p. 25, ¶ 32). During the trip to Las Vegas, Beverly administered her mother's medications and otherwise acted as her nurse. (R. 54, p. 16-17, ¶ 2, 3; R. 54, p. 18, ¶10; R. 54, p. 20, ¶16; R. 54, p. 25, ¶ 32-33). Beverly returned to work on January 28, 2008. (R. 54, p. 25, ¶34). Beverly was supposed to return to work on January 27, 2008, but because of a fire in her hotel in Las Vegas on January 26, 2008, she was unable to leave Las Vegas on January 26, 2008 as originally scheduled. (R. 54, p. 25, ¶34). Fischer testified that, if an employee provided appropriate documentation of a fire at her hotel that prevented her from returning to work on time, that would be an excusable absence. (R. 54, p. 25, ¶ 35).

Human Resources Manager Mary Ann Rowland reported to Rebecca Reierson. (R. 54, p. 25-26, ¶36). On January 17, 2008, Ms. Rowland received Plaintiff's January 15, 2008 Leave Request form from Janet McDonough and Eric Fischer. (R. 54, p. 26, ¶ 37). At the time she reviewed the Leave Request on January 17, 2008, Ms. Rowland knew that Beverly was seeking to travel to Las Vegas with her mother, that her mother was terminally ill, and that Beverly was planning to travel with her mother to Las Vegas as her primary caregiver. (R. 54, p. 26, ¶ 37). Ms. Rowland understood that the Fairygodmother Foundation was an organization similar to the Make-A-Wish Foundation. (R. 54, p. 26, ¶ 37). On January 17, 2008, Ms. Rowland claims that she made a determination that Plaintiff's request was not covered under the FMLA. (R. 54, p. 26, ¶ 37). Mary Ann Rowland testified that she instructed Beverly to submit FMLA

paperwork prior to the Las Vegas trip. (R. 54, p. 26, ¶ 38). However, Beverly had never spoken with Rowland prior to the trip to Las Vegas. (AF 38).

Beverly was terminated on March 21, 2008 for her absences on January 21st, 22nd, 23rd, 24th, and 27th of 2008, which the Park District alleged were unauthorized. (R. 54, p. 26-27, ¶39). Rebecca Reierson, the Director of Human Resources, made the final decision to terminate Beverly. (R. 54, p. 26-27, ¶39). Reierson relied on a recommendation from Human Resources Manager Mary Ann Rowland. (R. 54, p. 26-27, ¶39).

## SUMMARY OF THE ARGUMENT

The district court did not err in denying the Park District's motion for summary judgment. In its thorough analysis of the text and legislative history of the Family and Medical Leave Act, the district court correctly found that Beverly's trip to Las Vegas to care for her mother did not need to involve active medical care by a physician or serve a medical or palliative purpose. The district court correctly determined that the FMLA only requires that the employee seeking leave have a family member with a "serious health condition" and that the employee must use the leave "to care for" the family member. Under the Park District's interpretation, if a caregiver's leave of absence involves travelling with a seriously ill relative, there is an added requirement that the relative be receiving medical treatment during the leave. There is no basis in the statute for this extra requirement. The district court was correct in finding that the FMLA does not limit the care to a particular location. A contrary conclusion would lead to the illogical result that Beverly would have been protected by the FMLA if she stayed in Chicago for five days while caring for her mother but not if she accompanied her mother

out of state to care for her while she fulfilled a dying wish to travel to Las Vegas.

The Park District also relies heavily upon its proffered concern that providing FMLA protection to the Fairygodmother Foundation trip will open the floodgates to frivolous requests for FMLA leave. However, there is not a shred of evidence that Beverly's trip to Las Vegas was anything but a legitimate dying wish for her terminally ill mother arranged by an organization similar to the Make-A-Wish foundation. Accordingly, the Fairygodmother Foundation trip does not implicate the concerns raised by the Park District.

Alternatively, even if this Court determines that the trip to Las Vegas was required to serve some type of "ongoing treatment" function for Beverly's mother, it is clear that the trip satisfied such a requirement. Although the district court found that Appellee had not presented sufficient evidence to show that the Las Vegas trip served a medical or palliative function, Appellee respectfully disagrees with the district court on this point. Based on the Horizon Hospice letter of December 16, 2008, and Social Work Coordinator Roxanne Dominis's testimony that "as part of our agency's plan of care in providing hospice services to terminally ill patients, our medical and psychosocial team strives to help patients identify and meet end-of-life goals," a jury could reasonably infer that the trip to Las Vegas served a palliative function by providing Sarah Ballard with psychological benefits from spending time with her daughter at the end of her life fulfilling a wish to visit Las Vegas.

Indeed, the Social Worker from Horizon Hospice assigned to the Ballard family, Lindsay Wooster, informed Beverly and her mother of the existence of the Fairygodmother Foundation. Ms. Wooster assisted in filling out the application for the

Fairygodmother Foundation and even submitted it to the foundation for Sarah Ballard. The Fairygodmother Foundation issued a letter on December 19, 2007 to inform Sarah Ballard that her wish to take a trip to Las Vegas had been granted. Ms. Wooster personally delivered this letter to Beverly and her mother at their home. Clearly, these facts demonstrate that the trip to Las Vegas was arranged in connection with the hospice care provided by Horizon Hospice.

The legislative history of the FMLA is clear that the phrase "to care for" "is intended to be read broadly to include both physical and psychological care." S. Rep. No. 103-3, at 24 (1993). The legislative history also makes it very clear that the psychological care referenced therein is not limited to treatment by a psychologist. The legislative history explains that "parents provide far greater psychological comfort and reassurance to a seriously ill child than others not so closely tied to the child. In some cases there is no one other than the child's parents to care for the child. The same is often true for adults caring for a seriously ill parent or spouse." Id. (emphasis added). Any reasonable jury could conclude that the Fairygodmother Foundation trip provided Sarah Ballard with a psychological benefit by giving her a chance to spend quality time with her daughter while fulfilling her dying wish. No medical testimony is required to reach this common sense conclusion.

Accordingly, this Court can affirm the district court's denial of summary judgment on the alternative ground that the Las Vegas trip provided psychological benefits to Sarah Ballard as part of her hospice care. "The appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, *although his argument may involve an attack upon the reasoning of the lower court or an insistence*

*upon matter overlooked or ignored by it.*"  <u>Wellpoint, Inc. v. Commissioner of Internal</u> <u>Revenue</u>, 599 F.3d 641, 650 (7th Cir. 2010), citations omitted (emphasis in original).

## ARGUMENT

### A.    Standard of Review

This Court reviews a district court's grant or denial of summary judgment *de novo*.  <u>Harrell v. United States Postal Serv.</u>, 445 F.3d 913, 918 (7th Cir. 2008).  In doing so, this Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party.  <u>Harrell</u>, 445 F.3d 913 at 918.   "The appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, *although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.*"  <u>Wellpoint, Inc. v. Commissioner of Internal</u> <u>Revenue</u>, 599 F.3d 641, 650 (7th Cir. 2010), citations omitted (emphasis in original).

### B.    Legal Standard for FMLA Interference Claims

"To prevail  on an FMLA-interference claim, an employee must demonstrate that: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to FMLA leave; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her benefits to which she was entitled."  <u>Brown</u> <u>v. Auto Components Holding, LLC,</u> 622 F.3d 685, 689 (7th Cir. 2010).  In the instant case, it is undisputed that Plaintiff met the general eligibility requirements for FMLA protection and that the Park District was covered by the FMLA.  On appeal, the Park District's sole argument is that the district court erred in finding that Beverly Ballard's trip to Las Vegas to accompany her terminally ill mother on a trip granted to her by an organization similar to the Make-A-Wish Foundation was not covered by the FMLA.

**C.      Beverly's Trip to Las Vegas Was Protected Under the FMLA**

i.      Under the plain language of the FMLA, taking time off to "care for" a
relative is protected regardless of whether the relative is receiving active
medical treatment.

An employee may take protected time off of work under the Family and Medical

Leave Act "in order to care for the spouse, or a son, daughter, or parent, of the employee,

if such spouse, son, daughter, or parent has a serious health condition."  29 U.S.C. §

2612(a)(1)(C).  The U.S. Department of Labor's regulations define the situations that

constitute "caring for" a family member under the FMLA.  The regulations provide, in

part, "It includes situations where, for example, because of a serious health condition, the

family member is unable to care for his or her own basic medical, hygienic, or nutritional

needs or safety, or is unable to transport himself or herself to the doctor, etc."  29 C.F.R.

§ 825.116(a).  "The term also includes psychological comfort and reassurance which

would be beneficial to a…parent with a serious health condition who is receiving

inpatient or home care."  Id.

The legislative history of the FMLA provides, in part:

An employee could also take leave to care for a parent or spouse of any
age who is unable to care for his or her own basic hygienic or nutritional
needs or safety.  Examples include a parent or spouse whose daily living
activities are impaired by such conditions as Alzheimer's disease, stroke,
or clinical depression or who is recovering from major surgery or who is
in the final stages of a terminal illness.

S. Rep. No. 103-3, at 24 (1993) (emphasis added).

Appellant contends that the trip to Las Vegas was not protected by the FMLA

because it was not designed to serve a medical purpose.  However, the Appellant's

argument finds no support in the text of the FMLA or the governing regulations.  If

Congress had meant to limit the term "to care for" to situations in which an employee's

caregiving was rendered for the purpose of facilitating active medical treatment, it would have said so in the statutory text of the FMLA. See McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 342 (U.S. 1990) ("In the absence of contrary indication, we assume that when a statute uses [a term], Congress intended it to have its established meaning.)"

As the district court found, Beverly's leave of absence needed to satisfy two requirements in order to fall within the protection afforded to caregivers by the FMLA. First, Beverly had to have a relative with a "serious health condition." It is undisputed that Sarah Ballard's congestive heart failure was a "serious health condition." Second, Beverly had to use her leave of absence "to care for" her mother. It is undisputed that, during the trip to Las Vegas, Beverly attended to her mother's basic medical, hygienic and nutritional needs. The district court correctly found that Ballard's caregiving responsibilities constituted, at the very least, the type of physical care contemplated by the FMLA. (Memorandum Opinion and Order[8] at CPD 00013). As the district court correctly determined, the physical care provided by Beverly to her mother during the trip was sufficient to place the trip within the scope of the FMLA's protection. This is true because nothing in the text of the FMLA or the governing regulations indicates that "caring for" a relative under the FMLA requires that the relative be receiving active medical treatment during the period of care. Nor does the statutory text indicate that a caregiver's leave of absence must be for the purpose of furthering curative or palliative medical treatment for the caregiver's relative.

On the contrary, the legislative history provides that "an employee could take

---

[8] Citations to the district court's Memorandum and Opinion denying the Chicago Park District's Motion for Summary Judgment, contained in the Appellant's Appendix as documents numbered CPD 00004 through CPD 00022 appear as "Memorandum and Order" followed by the CPD page number.

leave to care for a parent who…is in a hospital or other health care facility. An employee

could <u>also</u> take leave to care for a parent…who is unable to care for his or her own basic

hygienic or nutritional needs or safety." S. Rep. No. 103-3, at 24. (emphasis added).

Clearly, protected leave is not limited to situations where the individual needing care is

receiving medical care in a hospital or other health care facility. Treatment from a

medical provider may not provide any benefits to a terminally ill individual. In fact, as

the district court noted, "the regulations recognize, in defining 'serious health condition,'

that terminally-ill family members might not be receiving active medical treatment at all:

a serious health condition is a condition that involves 'continuing treatment by a health

care provider,' including a

> period of incapacity which is permanent or long-term due to a condition
> for which treatment may not be effective. The employee or family
> member must be under the continuing supervision of, but need not be
> receiving active treatment by, a health care provider. *Examples include
> Alzheimer's, a severe stroke, or the terminal stages of a disease*.
>
> (Memorandum Opinion and Order at CPD 00011, *citing* 29 C.F.R.§
> 825.114(a)(2)(iv) (emphasis added)).

It is undisputed that, at the time of the Las Vegas trip, Sarah Ballard was still

under the care of a doctor. Indeed, just days before Beverly and her mother left for the

trip, Sarah Ballard's doctor gave Beverly instructions on how to care for her mother

while they were in Las Vegas. (R. 54, p. 25, ¶32). Accordingly, Sarah Ballard suffered

from the type of serious health condition explicitly contemplated by the FMLA

regulations in 29 C.F.R.§ 825.114(a)(2)(iv). Because Sarah Ballard had a "serious health

condition" as defined in the regulations even though she was not receiving active medical

treatment, it follows that her primary caregiver was entitled to receive FMLA protection

for care rendered during the Las Vegas trip even though no active medical care was

planned. As the district court correctly pointed out, "the regulations cover terminal illnesses for which there is no active treatment at all, so the regulations refute an attempt to link 'care' to participation in ongoing medical treatment." (Memorandum Opinion and Order at CPD 00013).

Beverly could have taken five days off of work to care for her mother's basic needs in Chicago, and that leave of absence would have been eligible under the FMLA even if it did not involve active medical care. Why should a leave of absence for a caregiver lose FMLA protection simply because it involves travelling out of state with the relative receiving care? As the district court correctly observed, "so long as the employee provides 'care' to the family member, where the care takes place has no bearing on whether the employee receives FMLA protections." (Memorandum Opinion and Order at CPD 00017).

Furthermore, Beverly's care of her mother involved providing psychological care to her mother by making sure she was comfortable, saying soothing things to her, rubbing her back and head, and propping her up in bed. (R. 54, p. 16-17, ¶3). This psychological care provides an additional basis for concluding that the Las Vegas trip was entitled to FMLA protection. In addition to physical care, Beverly provided her mother with "psychological comfort and reassurance which would be beneficial to a…parent with a serious health condition who is receiving inpatient or home care." See 29 C.F.R. §825.116(a). (R. 54, p. 16-17, ¶3). See also Bell v. Prefix, Inc., 2009 U.S. App. LEXIS 7006, * 9 (6th Cir. 2009) ("Furthermore, by reassuring his father and telling him that everything would be all right, Bell provided psychological care [for purposes of 29 C.F.R. §825.116]...").

Additionally, Beverly's mother had to visit a medical facility during the trip because she was unable access her medications due to a fire in the hotel where she and Beverly stayed. (R. 54, p. 25, ¶34). As the district court noted, "although the visit was unplanned, it underscores the importance of Ballard's supervision of her mother during the trip. Left to her own devices, Sarah Ballard would not have received her medications on time and could have suffered serious health consequences." (Memorandum Opinion and Order at CPD 00017).

ii.    Appellants's public policy arguments are unpersuasive

Although Appellant makes a "slippery slope" argument that the district court's ruling could encourage employees to use their relative's serious health condition as a ruse to take a vacation, there are no facts to suggest that that concern applies to the Las Vegas trip in this case. This is not an instance where Beverly Ballard attempted to justify taking a vacation for herself by bringing her terminally ill mother with her. It is undisputed that the trip to Las Vegas was granted to Sarah Ballard as a dying wish by the Fairygodmother Foundation, an organization which the Human Resources Manager for the Park District acknowledged was similar to the Make-A-Wish Foundation. (R. 54, p. 26, ¶37). Accordingly, there is no question that the purpose of the trip was to "care for" Sarah Ballard on a trip granted to her because of her terminal illness. As the district court correctly held, the statute requires that Beverly's mother have a "serious health condition" and the leave of absence be used by Beverly "to care for" her mother. Because the Fairygodmother Foundation trip satisfied those requirements, the district court properly denied the Park District's summary judgment motion. The fact that no medical treatment was planned for the trip is of no consequence. A caregiver can take

time off to care for a relative's basic needs regardless of whether the relative is receiving active medical treatment during the leave. Why should an extra requirement be added when the FMLA leave involves travelling with the relative?

Furthermore, although employers have an interest in minimizing litigation over decisions about what types of FMLA requests should be granted, this Court should not impose a bright line rule that would foreclose legitimate leaves of absence. It may be more convenient for human resource managers to have a simple test that would exclude all caregiver leaves of absence that do not further medical treatment. However, such a bright line rule would come at the cost of excluding leaves of absence taken in good faith by employees to assist in providing their loved ones with valuable experiences like the one provided by the Fairygodmother Foundation at issue in this case.

As Appellant notes in its brief, the Fairygodmother Foundation trip provided "an opportunity for peace, closure, and cherished memories." (Appellant Brief at pg. 8, citing R. 45, p. 13). Why shouldn't a caregiver's leave of absence to facilitate such an experience be protected by the FMLA? What if Ms. Ballard took time off to transport her mother to her grandchild's birthday party, school play or wedding? Nothing in the text of the FMLA states that a caregiver's protected leave should be limited to situations where her relative is suffering through medical treatment.

Ballard's request for a leave of absence was clearly legitimate. It was not a request for a vacation for herself disguised as an FMLA leave to care for her mother. She had documentation from the charitable Fairygodmother Foundation addressed to her mother explaining that the foundation was looking forward to granting her wish to travel to Las Vegas. (Ballard Dep. Ex. 7B, R. 38-3, p. 23). Indeed, the social worker from

Horizon Hospice had an active role in arranging the trip. An employer can easily distinguish this type of good faith request from the "subterfuge" that the Park District contends will be enabled by allowing the district court's ruling to stand.

Indeed, in one of the articles that the Park District cites to support its position, the author states that "while most of you would've probably let Ballard go on the trip if you were her employer, you see the dilemma this causes…what's to stop an employee from being able to take time off under the guise of FMLA leave for vacation if he or she takes an ill family member with them?" (See www.hrbenefitsalert.com/caring-vacationing-mom-fmla-leave/). The statement of the author that "most of you would've probably let Ballard go on the trip" illustrates how clear cut the issue in this case is. The Fairygodmother Foundation trip was legitimate, and there is not a shred of evidence to suggest that it was a scheme to allow Ballard to take a vacation for herself under the guise of FMLA leave. Clearly, a Human Resources manager presented with a request for a leave of absence like Ballard's would have no trouble determining that the request was above board. Affirming the district court's ruling will not create the type of Human Resources dilemma that the Park District suggests.

iii. The cases cited by Appellant in support of its argument that Beverly did not "care for" her mother are distinguishable or unpersuasive

None of the cases cited by Appellant involve a situation where the plaintiff sought time under the FMLA to care for a family member who was terminally ill. The court in Marchisheck v. San Mateo County, 199 F.3d 1068, 1071, 1075 (9th Cir.1999) based its holding on the fact that the plaintiff did not participate in the ongoing treatment of her son's medical condition but instead took him to the Phillipines so that he could avoid being beaten by certain acquaintances. The court stated that "the relevant administrative

rule, 29 C.F.R. § 825.116 [now 29 C.F.R. § 825.124(a)], <u>suggests</u> that 'caring for' a child with a 'serious health condition' involves some level of participation in ongoing treatment of that condition." (emphasis added). <u>Id</u>. at 1076. As the district court recognized, 29 C.F.R. § 825.116(a) does not actually state that the employee taking FMLA leave to care for a family member must participate in the treatment of the family member's serious health condition. Indeed, the district court stated that "there is no statutory or regulatory text stating something to the effect that 'care' must involve some level of participation in the ongoing treatment of the family member's condition under the FMLA." (Memorandum Opinion and Order at CPD 00013).

Nevertheless, Beverly did provide medical care to her mother during the trip to Las Vegas. (R. 54, p. 25, ¶32-33). Therefore, even though the primary purpose of the trip was not to seek medical treatment, Beverly's act of accompanying her mother to Las Vegas is distinguishable from the "care" at issue in <u>Marchisheck</u>. Furthermore, the court in <u>Marchisheck</u> noted that "there is *no evidence whatsoever* in the record that [the plaintiff's son] suffered any period of incapacity - inability to perform regular daily activities - as a result of his behavioral problems." <u>Id</u>. at 1075. In the instant case, it is undisputed that Beverly's mother was suffering from a terminal illness and needed someone to provide care for her.

Defendant also cites <u>Tellis v. Alaska Airlines</u>, a 9th Circuit case in which the plaintiff sought FMLA so that he could take a cross country trip to retrieve a family vehicle while his wife was experiencing difficulties with her pregnancy. <u>Tellis v. Alaska Airlines</u>, 414 F.3d 1045, 1046 (9th Cir. 2005). Notably, his wife did not accompany him on the trip. <u>Id</u>. Clearly, <u>Tellis</u> is distinguishable from the instant case, as Beverly

accompanied her mother on the Las Vegas trip and cared for her.

Defendant also cites <u>Leakan v. Highland Co.</u>, a case that is readily distinguishable from the facts of the instant case. Unlike the situation in <u>Leakan v. Highland Co</u>. (E.D. Mich. 1997), in which the plaintiff attempted to use her recent pregnancy to support an FMLA leave to visit her in-laws, Beverly was not using her mother's illness as an excuse to take a vacation. In <u>Leakan</u>, the plaintiff took a vacation and attempted to construe it as FMLA leave because she just happened to bring her newborn with her. <u>Leakan v. Highland Co</u>., 1997 U.S. Dist. LEXIS 20381, *10 (E.D. Mich. 1997). In contrast, Beverly's mother was fortunate enough to receive a dying wish to travel to Las Vegas with her daughter from a charitable foundation. In addition to the psychological benefits of having her daughter present with her on the trip, Sarah Ballard also needed her daughter to act as her primary caregiver during the trip.

Although <u>Tayag v. Lahey Clinic Hospital</u>, <u>Bhd. Of Maint. Of Way Employees</u>, and <u>Gradilla v. Ruskin Mfg</u>. do stand for the proposition that vacations are not covered under the FMLA, Beverly's trip with her mother to Las Vegas was not a mere vacation. It was a trip that would allow a terminally ill woman to realize an end of life goal, and share it with a close family member. Congress did not intend to foreclose such a leave of absence. Indeed, nothing in the statutory text of the FMLA would exclude coverage for the trip.

Furthermore, <u>Bhd. Of Maint. Of Way</u> is factually distinct from the case at bar. There, the dispute centered around whether the defendant rail carriers could (contrary to the terms of the applicable collective bargaining agreements) substitute unused paid vacation, personal, or sick leave when an employee took leave covered by the FMLA.

Bhd. Of Maint. Of Way Employees v. CSX Transp., Inc., 2005 U.S. Dist. Lexis 37950, * 3 (N.D. Ill. 2005). The court in Bhd of Maint. Of Way Employees did not examine whether a trip like the Fairygodmother Foundation trip would fall within the protection of the FMLA. The court merely pointed out that "vacation or personal time" are not enumerated in the "four defined circumstances" expressly set forth in 29 U.S.C. § 2612(a): "(1) the birth of a son or daughter of the employee and in order to care for such son or daughter; (2) the placement of a son or daughter with the employee for adoption or foster care; (3) the care of a spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition; or (4) a serious health condition that makes the employee unable to perform the functions of the position of such employee." Bhd. Of Maint. Of Way Employees, 2005 U.S. Dist. Lexis at *17-18.

It would not make any sense to prohibit an employee from taking leave to care for a relative during the relative's "personal time." Clearly, by saying that "vacation or personal time" was excluded by the FMLA, the court in Bhd of Maint. Of Way Employees was referring to the employee's "vacation or personal time," not the "vacation or personal time" of the relative receiving care from the employee. Beverly only took the trip to Las Vegas because it was granted to her mother as a dying wish due to her terminal illness. Accordingly, it was not Beverly's "vacation." Beverly's leave of absence to travel to Las Vegas with her mother falls within the third reason listed for leave in the statute – the care of a relative with a serious health condition.

Defendant cites the concern expressed by the court in Gradilla v. Ruskin Mfg. (9th Cir. 2003) about the problems that could result if caregivers were granted FMLA protection any time their ill family members wanted to travel. While there may be

potential for abuse of the FMLA's protection of caregivers, allowing an employee to accompany her terminally ill mother on a trip provided by a charitable foundation as a dying wish simply does not implicate the concerns expressed in <u>Gradilla</u>.

     iv.    <u>Beverly cared for her mother within the meaning of the FMLA</u>

Appellant argues that Beverly did not care for her mother within the meaning of the FMLA during the trip to Las Vegas because her care was not provided under one of the "major circumstances" permitting FMLA leave. However, the FMLA does not distinguish between "major" or "minor" circumstances of permitted leave. Protected leave is protected leave. As discussed, *supra*, "caring for" a family member under the FMLA is not limited to situations where the family member is in a hospital or other health care facility or where the care is provided in connection with inpatient care or periods of home care. In the instant case, Plaintiff provided not only physical and medical care during the Las Vegas trip, but she also provided psychological comfort to her mother. (R. 54, p. 16-17, ¶ 1, 2, 3; R. 54, p. 18, ¶ 10; R. 54, p. 19, ¶, 13, 14; R. 54, p. 20-21, ¶15, 16; R. 54, p. 25, ¶32-33). The phrase "to care for" "is intended to be read broadly to include both physical and psychological care." S. Rep. No. 103-3, at 24 (1993).

Defendant cites <u>Tayag v. Lahey Clinic Hosp</u>., 632 F.3d 788 (1st Cir. 2011), for the proposition that the "inclusion of 'psychological comfort and reassurance,' 29 C.F.R. § 825.116, in the definition of care cannot extend to the accompaniment of an ill spouse on lengthy trips unrelated to medical care." However, the situation in the instant case is fundamentally different from <u>Tayag</u>. In <u>Tayag</u>, the employee was not caring for a terminally ill family member. In the case at bar, Plaintiff's mother was terminally ill, and

no amount of medical treatment was going to change that. Plaintiff's mother had been diagnosed with end-stage congestive heart failure and had been granted a trip to Las Vegas by the Fairygodmother Foundation, a non-profit charitable organization which granted wishes to individuals facing terminal illness. (R. 38, p. 10-11, ¶37). The FMLA was intended to cover a leave of absence to care for a parent who is in the final stages of a terminal illness. See S. Rep. No. 103-3, at 24 (1993).

> v. The Fairygodmother Foundation trip to Las Vegas was part of Sarah Ballard's ongoing care from Horizon Hospice & Palliative Care

Appellee respectfully disagrees with the district court's conclusion that the Las Vegas trip did not serve a medical or palliative function. An article by the Mayo Clinic staff describes palliative care as follows:

> Palliative care is a multidisciplinary medical specialty that aims to improve quality of life for people who have serious or life-threatening illnesses. Palliative care takes into account the person's emotional, physical and spiritual needs and goals — as well as the needs of his or her family.
>
> Palliative care doesn't replace primary medical treatment. Instead, palliative care is provided in conjunction with all other medical treatment.

See "Palliative Care: Symptom relief during illness, available at http://www.mayoclinic.com/health/palliative-care/MY01051

"Palliative care is provided through comprehensive management of the physical, psychological, social, and spiritual needs of patients, while remaining sensitive to their personal, cultural, and religious values and beliefs." See "Palliative Care, An Ethical Obligation," available at http://www.scu.edu/ethics/practicing/focusareas/medical/palliative.html, *citing* Last Acts Campaign, Task Force on Palliative Care, Robert Wood Johnson Foundation, "Precepts of Palliative Care," Journal of Palliative Medicine 1, no. 2 (1998): 110.

As set forth in a December 16, 2008 letter from Horizon Hospice, Plaintiff's trip to Las Vegas as her mother's caregiver was arranged in connection with the hospice services provided to Sarah Ballard by Horizon Hospice & Palliative Care. (R. 54, p. 20-21, ¶16). The letter, signed by the Medical Director and Social Work Coordinator of Horizon Hospice & Palliative Care states that "As part of our agencies [sic] plan of care in providing hospice services to terminally ill patients, our medical and psychosocial team strives to help patients identify and meet end-of-life goals." (R. 54, p. 20-21, ¶16). Sarah Ballard's end of life goal was to travel to Las Vegas with her daughter. (R. 54, p. 20-21, ¶ 16; Ballard Dep., R. 38-2, 202:24 – 203:9).

There is no dispute that Beverly was her mother's primary caregiver, and that in addition to physical care, she provided her mother with "psychological comfort and reassurance which would be beneficial to a…parent with a serious health condition who is receiving inpatient or home care." See 29 C.F.R. §825.116(a). (R. 54, p. 16-17, ¶ 1, 2, 3; R. 54, p. 18, ¶ 10; R. 54, p. 19, ¶, 13; R. 54, p. 20-21, ¶15, 16; R. 54, p. 25, ¶32-33). The legislative history notes that the phrase "to care for" "is intended to be read broadly to include both physical and psychological care." S. Rep. No. 103-3, at 24 (1993). The legislative history also makes it very clear that the psychological care referenced therein is not limited to treatment by a psychologist. The legislative history explains that "parents provide far greater psychological comfort and reassurance to a seriously ill child than others not so closely tied to the child. In some cases there is no one other than the child's parents to care for the child. The same is often true for adults caring for a seriously ill parent or spouse." Id. A reasonable jury could certainly conclude that the trip conferred emotional benefits – peace, closure, and cherished memories (R. 38, p. 11,

¶38) – to Plaintiff's mother during the time that she was facing a terminal illness.

Appellant objected to admission of the December 16, 2008 Horizon Hospice letter on hearsay grounds. (R. 57[9], p. 2). The district court declined to consider the information contained in the December 16, 2008 letter because it found the letter to be inadmissible hearsay. Appellee submits that, contrary to the district court's finding, the December 16, 2008 letter is admissible as a business record under Fed R. Civ. P. 803(6). In her Declaration, Roxanne Dominis authenticates the December 16, 2008 letter, explaining that when she was Social Work Coordinator at Horizon Hospice, she drafted the December 16, 2008 letter and that the Medical Director for Horizon Hospice & Palliative Care, Dr. Joanna Martin, signed the letter as well. (R. 54, p. 20, ¶16; Declaration of Roxanne Dominis, included in R. 55 at pg. 2, ¶ 2). Ms. Dominis explains that she drafted the letter based on information provided to her by Lindsay Wooster, who was the Ballard family's primary Social Worker at the time. (Id.). Ms. Wooster was on maternity at the time of the letter. (Id.).

Fed. R. Civ. P. 803(6) provides an exception to the hearsay rule for "a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness…"

Ms. Dominis testified in her Declaration that the December 16, 2008 letter is a

_____

[9] Citations to "R. 57" refer to Defendant's Response to Plaintiff's Amended Local Rule 56.1(B) Statement of Additional Facts, followed by the page number.

type of record kept in the course of Horizon Hospice's regularly conducted business activity, and it was the regular practice of that business activity to make such records upon requests from patients or their family members, or when otherwise necessary. (R. 55 at pg. 2, ¶ 3). Additionally, as the letter was drafted based on information communicated by the Ballard family's primary Social Worker, Lindsay Wooster, it was clearly made from information transmitted by a person with knowledge of the facts set forth in the letter. (ROA 55 at p. 2, ¶ 2). As former Social Work Coordinator and a current Social Worker at Horizon Hospice, Ms. Dominis is clearly qualified to lay the foundation to establish that the December 16, 2008 letter is a business record.

Furthermore, it should be noted that the Park District cited the December 16, 2008 letter (which was introduced as Exhibit 16 at Beverly Ballard's deposition) **in its own Local Rule 56.1 statement of facts**. (R. 38, p. 11, ¶40, citing Ballard Dep. Ex. 16, R. 38-3, p. 38). Appellant cannot have it both ways. The fact that the Park District relied on the December 16, 2008 Horizon Hospice letter in support of its summary judgment motion should result in a waiver of its hearsay objection to Appellee's use of the same document.

However, even if this Court finds that the December 16, 2008 letter is inadmissible, Roxanne Dominis testified in her declaration that "as part of its plan of care in providing hospice services to terminally ill patients, Horizon Hospice & Palliative Care's medical and psychosocial team strives to help patients identify and meet end-of-life goals." (R. 55 at p. 3, ¶ 4). A reasonable jury could infer from this alone that the Las Vegas trip more likely than not served an "ongoing treatment" function for Sarah Ballard.

Indeed, the social worker from Horizon Hospice played an active role in arranging the Fairygodmother Foundation trip. Lindsey Wooster from Horizon Hospice had originally informed Beverly and her mother of the Fairygodmother Foundation's existence. (Ballard Dep., R. 38-1, 151-152). Ms. Wooster was the primary social worker from Horizon Hospice assigned to Beverly and her mother. (Ballard Dep., R. 38-1, 101; Declaration of Roxanne Dominis, R. 55 at p. 2, ¶ 2). Around November 2007, Ms. Wooster informed Sarah Ballard that the Fairygodmother Foundation was an organization like Make-A-Wish and that she might be a candidate because she was diagnosed as having six months to live. (Ballard Dep., R. 38-1, 151:2 – 151:9). Ms. Wooster assisted Beverly and her mother in filling out the Fairygodmother Foundation application, and Ms. Wooster submitted the application. (Ballard Dep., R. 38-2, 153:23 – 154:1-17).

Prior to December 19, 2007, Sarah Ballard signed a "Wish Agreement" with the Fairygodmother Foundation. (R. 38, p. 6, ¶18, Ballard Dep. Ex. 9, R. 38-3, p. 27-31). Ms. Wooster filled out the first page of the Wish Agreement. (Ballard Dep., R. 38-2, 158:1-6; Ballard Dep. Ex. 9, R. 38-3, p. 27-31). Ms. Wooster even personally delivered the December 19, 2007 Fairygodmother Foundation letter to Beverly and her mother, which informed them that the Las Vegas trip had been granted. (Ballard Dep., R. 38-1, 149:12 – 150:16; Ballard Dep. Ex. 7B, R. 38-3, p. 23). Palliative care "is usually provided by a specialist who works with a team of other health care professionals, such as doctors, nurses, registered dieticians, pharmacists, and <u>social workers</u>." <u>See</u> "Palliative Care in Cancer," available at www.cancer.gov/cancertopics/factsheet/Support/palliative-care. Why would the Social Worker from Horizon Hospice submit the application to the Fairygodmother Foundation and deliver this letter to Beverly and her mother if the

Fairygodmother Foundation trip was not part of the plan for hospice and palliative care?

Even if this Court completely disregards the testimony of Ms. Dominis, the December 16, 2008 Horizon Hospice letter, and the active involvement of Horizon Hospice in arranging the Fairygodmother Foundation trip, any reasonable jury could find that the trip to Las Vegas provided the type of psychological benefits for Sarah Ballard contemplated by the FMLA. No medical testimony is necessary to establish that taking a trip with a loved one is likely to provide psychological benefits to a terminally ill person.

## <u>CONCLUSION</u>

For the foregoing reasons, the Appellee, Beverly Ballard, respectfully requests that this Honorable Court affirm the district court's order denying the Chicago Park District's Motion for Summary Judgment.

Respectfully submitted,

Appellee,
Beverly Ballard

By:   <u>/s/ Paul W. Ryan</u>
One of her attorneys

Eugene K. Hollander
Paul W. Ryan
Bradley J. Smith
**The Law Offices of Eugene K. Hollander**
230 W. Monroe, Suite 1900
Chicago, IL 60606
(312) 425-9100

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing Brief of Plaintiff-Appellee Beverly Ballard complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,029 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 97-2003 in 12 point Times New Roman font.

/s/ Paul W. Ryan

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 2, 2013, the Brief of Plaintiff-Appellee Beverly

Ballard was filed with the Clerk of the Court for the United States Court of Appeals for

the Seventh Circuit by using the appellate CM/ECF system.

The following participant in the case is a registered CM/ECF user and will be

served by the appellate CM/ECF system:

Nelson A. Brown Jr.
CHICAGO PARK DISTRICT
Law Department
3rd floor
541 N. Fairbanks Court
Chicago, IL 60611


/s/  Paul W. Ryan